IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2021 Session

## STATE OF TENNESSEE v. ANDREW G. WALSH

**Appeal from the Criminal Court for Davidson County**
**No. 2019-I-465      Steve R. Dozier, Judge**

_____

### No. M2020-00057-CCA-R3-CD

_____

The Defendant, Andrew G. Walsh, pleaded guilty to two counts of unlawful photography, and he agreed to concurrent sentences of eleven months and twenty-nine days. After a sentencing hearing, the trial court denied alternative sentencing and judicial diversion and ordered the Defendant to register as a sex offender. On appeal, the Defendant argues that the trial court erred in making its sentencing decisions. We affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Erin D. Coleman, Nashville, Tennessee, for the appellant, Andrew G. Walsh.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Glenn Funk, District Attorney General; and Patrick Newport, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

According to the guilty plea hearing transcript, the underlying case arose when the Defendant placed a hidden, motion-activated camera in a guest bathroom at his home to capture video of his female roommate, the victim, in the nude. On June 7, 2019, the victim reported finding the device to the police and turned over a thirty-two-gigabyte micro SD card that was inside it. A search of the micro SD card revealed that the device

captured nude video of the victim and her sixteen-year-old relative ("the minor victim"). The Defendant pleaded guilty to two counts of unlawful photography on November 7, 2019. In the plea agreement, he agreed to concurrent sentences of eleven months, twenty-nine days. The agreement provided that the trial court would decide whether to order probation, diversion, or confinement and whether the Defendant would be placed on the sex offender registry.

The presentence report, the minor victim's impact statement, the Defendant's statement, a letter from the Defendant's therapist, and a statement given by the Defendant's father were entered as exhibits at the sentencing hearing. The presentence report showed that the Defendant had no prior criminal history, no reported mental health issues, and no reported problems with drugs or alcohol. The Defendant obtained a Bachelor's degree in Exercise Science in 2010, and he was employed as a personal trainer. No risk and needs assessment was completed because the Defendant relocated to Texas.

The minor victim reported in her impact statement that the incident had caused her to feel uncomfortable in dressing rooms and bathrooms, where she was always looking for a camera. She explained that she never thought about a hidden camera being in those places before the Defendant secretly recorded her. When the incident occurred, she was already attending counseling but had to make an appointment sooner because she felt like she needed to talk to someone. The incident caused the minor victim to have anxiety attacks so often that she had to withdraw from school to be homeschooled. The minor victim read a small portion of her victim impact statement at sentencing.

The presentence report summarized the Defendant's statement to police, in which he admitted to purchasing the device to view the victim in the nude and admitted that he was aware that the minor victim was being secretly recorded. The Defendant stated in his personal questionnaire from the presentence report that he did not know the minor victim was visiting his home that weekend. He wrote in the questionnaire that when he discovered the minor victim was in the home, he asked about the device but that the minor victim was using it. He stated that he did not intend to spy on the minor victim, but he knew that the camera would inevitably capture her in the guest bathroom and that she took the device into another bedroom to use overnight.

The letter from the Defendant's therapist indicated that the Defendant began attending therapy sessions to cope with the stress related to the crime he committed. Mr. William Walsh, the Defendant's father, stated that he and his wife were shocked when they learned of the Defendant's conduct. The Defendant previously provided help on their farm and took care of the Defendant's brother, who was suffering from end-stage

Huntington's disease. Mr. William Walsh stated that the Defendant was honest, remorseful, and ready to accept the consequences of his actions.

At the sentencing hearing, Metropolitan Nashville Police Department Detective Robert Carrigan testified that he investigated the case when his department received a call regarding a hidden camera that had been found in a residence by the victim. The victim reported to Detective Carrigan that she had been a friend of the Defendant, that she had known him for one to two years, and that she moved in and started renting a room from him after ending a relationship with another person earlier in 2019. Around mid-May, the victim noticed a device in her bathroom that appeared to be a USB charging block. She asked the Defendant about the device, and the Defendant informed her that it was there for his personal training clients to charge a cell phone. In June, the victim had the minor victim over to visit. The minor victim brought the device to the victim, reported that she noticed something odd about the device, and informed her that she thought it might be a camera. Detective Carrigan testified that, during an interview with the victim and the minor victim, the victim confronted the Defendant about the device in a controlled telephone call. During the call, the Defendant admitted to purchasing the device over the internet and putting it in the guest bathroom the victim used so that he could capture nude videos of the victim. The Defendant also acknowledged to the victim that his actions were wrong.

Detective Carrigan testified that a warrant to search the Defendant's home was executed on June 12, 2019, and that he interviewed the Defendant during the search. The Defendant informed Detective Carrigan that he had known the victim for a couple of years, that he was attracted to her, and that when he asked her out, she indicated she was not interested in any kind of romantic relationship with him. The Defendant admitted that he bought the device in mid-May of 2019 and placed it in the bathroom, capturing several videos of the victim getting in and out of the shower and using the toilet. He admitted to masturbating while watching a recorded video of the victim on at least one occasion. He also admitted that the device had been in the bathroom that the minor victim was using when she visited the victim, but he asserted his primary target was the victim and that the device inadvertently captured video of the minor victim.

The Defendant informed Detective Carrigan that the micro SD card inside the device would only hold approximately twenty videos, so he removed the card periodically to clear it to obtain more videos. The Defendant admitted that, during this process, he saw that the device captured videos of both the victim and the minor victim. He also admitted to storing the videos on a desktop computer inside a folder entitled "golf videos," but he deleted the videos once he was confronted by the victim. He informed Detective Carrigan that he purchased three devices in total, but he could only get the one device working and threw the other two devices away after the victim

confronted him about the device which she found.  During the search of the residence, Detective Carrigan recovered the desktop computer, a cell phone, flash drives, and a camera.  On the micro SD card turned in by the victim, Detective Carrigan found videos of the minor victim getting undressed, walking around nude, and using the toilet.  He also found on the micro SD card videos of the victim in the shower and using the toilet.  Detective Carrigan found additional videos of the victim and the minor victim on the desktop computer.  On cross-examination, Detective Carrigan agreed that there was no evidence that the videos were distributed to others.

The victim testified that she met the Defendant at a gym when they had a conversation about personal training.  She and the Defendant had lunch on multiple occasions after that, and they got to know each other over the course of several months to a couple of years.  The victim testified that she asked the Defendant if she could rent a room from him since she knew his home had three bedrooms.  The victim lived with the Defendant for at least a year before she found the device.  She testified that she noticed the device in the bathroom for several weeks and that the Defendant told her, "there is a charger in there if you need it.  It's for my clients.  Please if you get it, put it back in the bathroom."  She explained that the device looked like a charging block and that she did not have any reason to think it was a camera.

The victim testified that the minor victim came to visit her and that she had specifically asked the Defendant's permission prior to inviting the minor victim.  The minor victim asked to use a charger, and the victim instructed her to ask the Defendant for permission to use the device in the guest bathroom.  The minor victim asked the Defendant for permission to use the device, and the Defendant consented and explained that she should return the device to the bathroom because it was for his clients.

After a few days, the minor victim approached the victim with the device and told her that she thought the device was a camera.  The victim inspected the device and concluded that it was a camera.  The victim confronted the Defendant over the telephone, and he told her that it was not a camera and that he was on the way to the house.  When the Defendant arrived, he took the device, walked away and crushed it, and brought it back to the victim.  The victim asked for the micro SD card located inside the device.  The Defendant denied there was one, but he eventually gave the victim the card after she continued asking for it.  The victim took the card to an electronics store and viewed the contents of the card on one of its computers.  The victim explained that the dates on the files were years old, but when she viewed the files she knew by their content that they were actually recent. She saw videos of herself getting in the shower naked and using the toilet.  Viewing the videos made her feel scared, anxious, and embarrassed.  She testified that, at the end of her time living with the Defendant, he would make comments that he

had "never seen [his] roommate naked," but she never thought that he would actually record her.

The victim testified that the incident made her not trust people and feel violated and scared. She explained that she felt like someone was going to put a camera in bathrooms she visited, even in her own apartment. She testified that she sought counseling after the incident.

The Defendant testified that he took full responsibility for his actions and that he apologized for them. He testified that he had not been in trouble previously, and that he had been attending therapy since the incident. Regarding the impact his conduct had on his family, the Defendant explained that he realized it affected more people than just himself when "the news broke [the] story" and that the magnitude of it was "overwhelming." He testified that since the incident, he had moved to Texas and started a new job to obtain a "fresh start." He did not expect to repeat his conduct again, and he stated that he had learned his lesson.

On cross-examination, the Defendant testified that he spent approximately one weekend researching how to record the victim once she moved in with him. He ordered three devices and installed them once they arrived. He admitted to removing the SD card from the one functioning device for videos every night and returning it to film more videos every night for a period of three or four weeks. He admitted watching the videos and masturbating to them one time. He agreed that approximately three or four weeks after installing the device, he was confronted by the victim after he allowed the minor victim to use the device as a charger. He agreed that he allowed the minor victim to take the device into her bedroom knowing that it would capture video of her. In response to the trial court's questioning, the Defendant testified that he did not refuse the minor victim's request to use the device because he wanted to stay inconspicuous and insisted that his intention was to capture images of the victim only. He agreed he did not destroy the SD card even though he knew that it had captured videos of the minor victim after he had allowed her to take the device into her bedroom. He agreed that he viewed videos of the minor victim because they were accessible with the videos of the victim. The Defendant testified that he moved to Texas because he had family who lived there. He agreed that he viewed pornography following his act of recording the victims nude without their permission and that he had not yet talked to his counselor about that subject.

On redirect examination, the Defendant testified that he viewed the videos of the minor victim because he could not tell what was on each video file prior to viewing it. Once he viewed the videos of the minor victim, he deleted them from his computer. In response to further questioning from the trial court, he testified that he provided Detective

Carrigan with information to allow Detective Carrigan to recover the deleted videos of the minor victim.

Mr. William Walsh testified that he did not understand why the Defendant committed the offense, that he did not think there was any risk that the Defendant would reoffend, and that he did not "think the world would be safer were he on the sex offender registry." He explained that he thought the Defendant realized the extent of his mistake, noting that the Defendant's "picture was all over the internet," that the Defendant could not get a job or pass a background check, and that the Defendant caused embarrassment to his family and devastated the victims.

The trial court considered the evidence presented at the hearing, the presentence report, and the purposes and principles of sentencing. The trial court found the Defendant's statement that he was unaware the minor victim was visiting and that he learned she was using the device inconsistent with his hearing testimony that she asked to use the device and he knowingly allowed her to use it. The trial court found, in relation to the Defendant's viewing of pornography, that "to be in therapy having been caught doing this, and still having issues with sexuality and videos is problematic." The trial court found that the Defendant's offenses were serious. The court found that the Defendant planned the offense for days and weeks and executed the offenses over a period of weeks. The trial court explained that the Defendant knew what would happen to him if he got caught and did it anyway, including knowing that a minor might be captured on video and leaving the device operational. The trial court acknowledged that the Defendant did not distribute the videos to others, which it found to be a positive factor. However, the trial court also considered the emotional impact on the victims, that the Defendant violated a position of trust, and that he used the videos for his own pleasure and excitement. The trial court found that the Defendant did not have a prior criminal record. The trial court found that it would not know what was occurring or whether the Defendant's case would be expunged if it allowed the Defendant to return to Texas on probation or diversion. The court cited to Mr. William Walsh's statement and testimony that he could not explain why the Defendant committed the offense. The trial court also explained that it would not be fair to grant diversion for a college graduate with no criminal record under these circumstances because it "almost makes it worse" that the Defendant would risk being caught knowing "what all of this would cause if [they] found out about it."

In relation to deterrence, the trial court found that there was some interest in deterrence for the Defendant and for others likely to commit similar offenses. The trial court also referred to the testimony from the Defendant and his father that the case had been publicized on the internet. The trial court found that confinement was necessary "to avoid depreciating the seriousness of the offense and deter any others likely to do this

from doing it again." The court cited to the public's interest in being informed of the Defendant's offenses. The trial court found that the victims and "others likely to be in [the Defendant's] position" needed to see under similar circumstances that "you can't come in and expect to . . . get expungable probation and that be the end of it."

The trial court denied the Defendant judicial diversion and probation, ordered him to serve his sentence in confinement, and ordered him to be placed on the sex offender registry when released from confinement. This appeal followed. However, while pending appeal, the Defendant filed a motion to seek relief from the trial court's judgment in light of the COVID-19 pandemic. The trial court granted the Defendant's motion on April 29, 2020, and suspended the balance of the Defendant's sentence to supervised probation and ordered the Defendant to register as a sex offender.

## ANALYSIS

The Defendant argues that the trial court erred in denying him an alternative sentence, denying him judicial diversion, and ordering him to register as a sex offender. The State responds that the issue regarding the alternative sentence is moot because the Defendant has been granted an alternative sentence. The State also argues that the trial court properly exercised its discretion in imposing the conditions of his sentence.

### A. Alternative Sentence

The Defendant first challenges the trial court's decision to deny him an alternative sentence; however, we agree with the State that this issue is moot. Mootness is a doctrine utilized by courts to determine the justiciability of a controversy. *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994). "Cases must be justiciable not only when they are first filed but must also remain justiciable throughout the entire course of the litigation, including the appeal." *Id.* (citations omitted) An issue is not justiciable when it lacks "a genuine and existing controversy requiring the present adjudication of present rights." *Id.* (citing *State ex rel. Lewis v. State*, 347 S.W.2d 47, 48 (Tenn. 1961); *Dockery v. Dockery*, 559 S.W.2d 952, 954 (Tenn. Ct. App. 1977)).

> A moot case is one that has lost its justiciability either by court decision, acts of the parties, or some other reason occurring after commencement of the case. A case will be considered moot if it no longer serves as a means to provide some sort of judicial relief to the prevailing party.

*Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cty.*, 301 S.W.3d 196, 204 (Tenn. 2009) (internal citations omitted).

In *State v. Terry Moore*, the defendant appealed the trial court's order revoking his probation and ordering him to serve his sentence in confinement. No. 02C01-9509-CC-00257, 1996 WL 432342, at *1 (Tenn. Crim. App. Aug. 2, 1996). After the order was issued but before the case was heard on appeal, the Defendant was released from confinement to probation. *Id.* A panel of this court dismissed the Defendant's appeal after concluding that the issue raised by the Defendant was moot. *Id.* at *2. The court reasoned that "it is obvious that this court cannot provide any meaningful relief to the Defendant even if we determine that the trial court erred by revoking the Defendant's probation." *Id.*; *see State v. Samuel D. Perry*, No. 02C01-9611-CR-00435 (Tenn. Crim. App. Jan. 29, 1998) (citing *Terry Moore* and affirming a trial court's denial of probation on mootness grounds because the defendant had been paroled for approximately a year before the case was heard on appeal). Similarly, in the case presently before this court, the Defendant challenges the denial of an alternative sentence but has since been released on supervised probation. Accordingly, this court can no longer provide the Defendant relief on the issue of whether the trial court erred in denying him an alternative sentence and ordering him to be confined prior to his release on probation. We conclude that this issue is moot.

### B. Judicial Diversion

The Defendant also appeals the denial of judicial diversion. When a qualified defendant pleads guilty or nolo contendere to a misdemeanor crime, the trial court may defer proceedings and place the defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A). "If the accused successfully completes the requisite probationary period, the trial court is required to discharge the accused and dismiss the proceedings," and the offender's record may be expunged. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The effect of expungement is to restore the defendant to the position occupied prior to arrest or indictment or information. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014). If the probationary period is not successfully completed, then judgment of guilt is entered and a sentence is imposed. *Id.* The statute defines which defendants are qualified to apply for diversion, and the parties here do not dispute that the Defendant was qualified to be considered for diversion. *See* T.C.A. § 40-35-313(a)(1)(B)(i).

A defendant who qualifies for the diversion program is not entitled to be sentenced to diversion. *King,* 432 S.W.3d at 323 (citations omitted). Like other sentencing decisions, the trial court's decision to grant or deny diversion is reviewed for an abuse of discretion. *Id.* at 324-25. "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *State v. Banks*, 271 S.W.3d 90, 116 (Tenn.

2008).  Although the deferential standard of review articulated in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012), applies to the decision to grant or deny diversion, the common law factors which the trial court has long been required to consider in its decision have not been abrogated.  *King*, 432 S.W.3d at 326.  Accordingly, a trial court determining whether judicial diversion is appropriate must consider:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice — the interests of the public as well as the accused.

*Parker*, 932 S.W.2d at 958 (footnote omitted); *see State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).  In addition to considering these factors, the trial court must weigh them against one another and place an explanation of its ruling on the record.  *King*, 432 S.W.3d at 326 (citing *Electroplating, Inc.*, 990 S.W.2d at 229).

If the trial court has adhered to these requirements, the reviewing court applies a presumption of reasonableness to the trial court's decision and merely looks to see if "any substantial evidence" exists in the record to support the trial court's decision.  *Id.* at 326, 327.  The trial court need not recite all of the factors, but the record must reflect that it considered each factor, identified the specific factors applicable to the case, and addressed the relevant factors.  *Id.* at 327.  If the trial court does not consider the appropriate factors delineated in *Parker* and *Electroplating* or does not place its reason for granting or denying diversion on the record, then the "presumption of reasonableness does not apply and the abuse of discretion standard, which merely looks for 'any substantial evidence' to support the trial court's decision, is not appropriate."  *Id.* Instead, the appellate court may, in its discretion, either review the trial court's decision de novo or remand for reconsideration. *Id.* at 328.

Here, the record does not reflect that the trial court addressed each of the *Parker* and *Electroplating* factors or that it weighed them against each other, so the abuse of discretion standard is not appropriate.  *See King*, 432 S.W.3d at 327.  However, the trial court's factual findings during the sentencing hearing are adequate to allow this court to review its decision de novo. *Id.* at 328.

The trial court found that the Defendant continued viewing pornographic material after being charged with the offense and failed to discuss that issue with his therapist, which reflects on his amenability for correction.  Also reflecting on the Defendant's amenability to correction is his statement included in the presentence report, in which he

- 9 -

stated that he did not know the minor victim was visiting his home and that he discovered her using the device. As the trial court found, the statement was contradicted by the victims' testimony and the Defendant's own testimony at the hearing that he knew the minor victim was visiting and that he knowingly permitted her to use the device after she requested permission to do so. Regarding the circumstances of the offense, the trial court found that the Defendant planned the offense for days and weeks and executed the offenses over a period of weeks, violated a position of trust, allowed the device to remain operational knowing it could capture nude video of the minor victim, and in that the victims suffered emotionally. The trial court also acknowledged that the Defendant did not distribute the videos to others, which it found to be a positive factor.

The trial court found that the Defendant did not have a prior criminal record. The Defendant's social history, including his education, work experience, and history of caring for his brother and his family's farm weigh positively at first glance. However, as the trial court found, the Defendant was willing to risk his high social position to commit the crimes. Additionally, the record indicates that the Defendant fled to Texas to obtain a "fresh start" prior to sentencing. The trial court did not make specific findings relating to the Defendant's physical and mental health. However, the record showed that the Defendant was in good physical and mental health except for his testimony that the aftermath of his crimes was "overwhelming" and that the stress led him to seek therapy sessions to help him cope. Regarding the deterrence value to the accused as well as others, the trial court found that there was some interest in deterring the Defendant specifically and others "likely to commit similar offenses." In relation to that finding, it noted that the crimes had been publicized on the internet. The trial court found that the victims "and others likely in [the Defendant's] position" need to see that "you can't come in and expect [to] . . . get expungable probation and that be the end of it," which relates to whether diversion would serve the ends of justice. The trial court also found that its own ability to monitor the Defendant's progress and expungement would be impaired because he moved to Texas.

Based on our de novo review, we conclude that the trial court did not err in denying the Defendant diversion. Despite the Defendant's lack of criminal record, relatively positive social history, and positive physical and mental health, the remaining factors weighed heavily against diversion. The circumstances of the offense weighed negatively against diversion, as the Defendant's conduct was calculated, spanned a period of weeks, and caused emotional damage to the victims. The Defendant's conduct after the offense weighed negatively on his amenability to correction, including continuing to watch pornographic videos and making an inconsistent statement about what occurred with respect to the minor victim. There is value in deterrence to the Defendant and to others, especially considering the offenses were publicized on the internet. Finally, judicial diversion would not serve the ends of justice. As the trial court's findings

implied, the public's interest in the Defendant facing more serious consequences than a term of probation followed by expungement outweighs his own personal interest in quickly obtaining a clean slate through the diversion program. After considering the *Electroplating* and *Parker* factors, including how they weigh against one another, and the trial court's findings, we conclude that the trial court did not err in denying the Defendant diversion.

### C. Sex Offender Registry

The Defendant contends that the trial court abused its discretion by failing to consider the required factors before ordering that he register as a sex offender. The parties to this appeal agree that the trial court's decision to require the Defendant to register as a sex offender should be analyzed under an abuse of discretion standard. However, this court has not yet determined the standard of review applied to a trial court's determination that a Defendant must register as a sex offender under Tennessee Code Annotated section 39-13-605(f).

In *State v. Ryan Broadrick*, No. M2017-01136-CCA-R3-CD, 2018 WL 4203883, at *7 (Tenn. Crim. App. Sept. 4, 2018), a panel of this court held that the *Bise* abuse of discretion accompanied by a presumption of reasonableness standard applied to a trial court's determination that a defendant should be required to register as a sex offender under Tennessee Code Annotated section 39-13-506(d)(2)(B). Section 39-13-506(d)(2)(B) states that:

> In addition to the punishment provided for a person who commits statutory rape for the first time, the trial judge may order, after taking into account the facts and circumstances surrounding the offense, including the offense for which the person was originally charged and whether the conviction was the result of a plea bargain agreement, that the person be required to register as a sexual offender pursuant to title 40, chapter 39, part 2.

The court reasoned that the *Bise* standard applied to a trial court's determination under the statute because our supreme court extended the standard to review of "a trial court's sentencing decision to either grant or deny judicial diversion." *Ryan Broadrick*, 2018 WL 4203883, at *7. Additionally, the court reasoned that the "may order" language in the statute gave trial courts discretion to place an offender on the sex offender registry and that its discretionary role is "virtually identical" to its role in deciding the other conditions of a sentence. *Id.*

Regarding the present case, section 39-13-605(f) states,

- 11 -

In addition to the punishment provided for a person who commits the misdemeanor unlawful photographing in violation of privacy, the trial judge may order, after taking into account the facts and circumstances surrounding the offense, including the offense for which the person was originally charged and whether the conviction was the result of a plea bargain agreement, that the person be required to register as a sexual offender pursuant to the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act of 2004, compiled in title 40, chapter 39, part 2.

Like the statute at issue in *Ryan Broadrick*, section 39-13-605(f) at issue in this case provides that a trial court "may order" a defendant to register as a sex offender after first considering particular factors. Such statutory language indicates that trial courts have discretion to require defendants convicted of misdemeanor unlawful photography to register as sex offenders. Accordingly, we conclude that the appropriate standard of review for a trial court's determination that a defendant should be required to register as a sex offender under section 39-13-605(f) is an abuse of discretion accompanied by a presumption of reasonableness.

In making the decision to require that a defendant register as a sex offender, the trial court must consider "the facts and circumstances surrounding the offense, including the offense for which the person was originally charged and whether the conviction was the result of a plea bargain agreement." T.C.A. § 39-13-605(f). As we concluded in *Ryan Broadrick* by interpreting the similar statutory language found in Section 39-13-506(d)(2)(B), a trial court may also consider "'any additional relevant factors' such as a psychosexual evaluation, a presentence report, and any other facts deemed relevant by the court.'" *State v. Quantorius Rankins*, No. M2019-00687-CCA-R3-CD, 2020 WL 5204229, at *6 (Tenn. Crim. App. Sept. 1, 2020), *no perm. app. filed* (quoting *Ryan Broadrick*, 2018 WL 4203883, at *8-9).

As the Defendant concedes, the trial court considered the circumstances of the offense in determining that he must register as a sex offender. The trial court found that the offense was serious; that the Defendant planned and executed the offense over a period of weeks; that the Defendant knew what would happen if he got caught and utilized the device anyway; that he knew a minor might be captured on video and left the device operational; that the Defendant did not distribute the videos; and that the Defendant violated a position of trust, used the videos for his own "pleasure and excitement," and caused an emotional impact on the victims. Accordingly, the record supports the trial court's decision. Contrary to what the Defendant's argument implies, the trial court was not required to restate these factors contemporaneously with its decision to require the Defendant to register as a sex offender. *See Quantorius Rankins*,

2020 WL 5204229, at *8 (affirming the trial court's order requiring the Defendant to register as a sex offender for his statutory rape conviction despite the court not weighing related factors on the record because the court had already discussed them in its decision to deny judicial diversion). We note that the Defendant was charged by criminal information of one count with respect to each victim even though the proof established that he took the separate act of downloading the videos and replacing the memory card on the device every night over a period of weeks.

The Defendant also argues that the trial court misapplied the deterrence factor in its decision to require him to register as a sex offender. The Defendant cites *State v. Horne*, 612 S.W.2d 186 (Tenn. Crim. App. 1980), and *State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000), which held that a trial court must support its application of the deterrence factor with proof that deterrence is necessary when the decision to incarcerate is based solely on deterrence. Even assuming that the *Horne* and *Hooper* decisions apply to a trial court's determination that a defendant should be required to register as a sex offender,[1] the Defendant's argument is unpersuasive because the trial court relied on several factors in addition to deterrence. The trial court found that there is some interest in deterring the Defendant specifically and others "likely to commit similar offenses." It also considered the offense for which the person was originally charged and whether the conviction was the result of a plea bargain agreement in addition to several other factors it found relevant. Therefore, the trial court's decision was not based solely on deterrence and was otherwise supported by the record. We conclude that the trial court did not abuse its discretion.

## CONCLUSION

Based upon the foregoing reasons, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

---

[1] Our courts have declined to decide whether the *Hooper* factors apply in sentencing decisions outside of the decision to order confinement or probation, such as judicial diversion, *see State v. Hamilton*, 498 S.W.3d 7, 19 n.7 (Tenn. 2016); *see also State v. Joshua Michael Ward*, No. E2018-01781-CCA-R3-CD, 2019 WL 3244991, at *7 (Tenn. Crim. App. July 19, 2019), *no perm. app. filed*.